## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

William R. Metallo,
     Plaintiff,

Vs.
                            Civil Action No. 6:14-cv-1975 Orl-40KRS
                            And Demand for Jury Trial

Orlando Utilities Commission,
Dan Kirby,
John Hugh Buddy Dyer,
Wayne R. Zimmermann,
     Defendants.

### COMPLAINT

COMES NOW, the plaintiff, William R. Metallo, appearing pro se, and for a complaint against the defendants above named, states, alleges, and avers as follows:

### JURISDICTION

1. This Court has subject matter jurisdiction under 28 U.S.C. sections 1331 and 1343.

2. This action is commenced pursuant to 2201 and 2202 and 42 U.S.C., section 1983.

### GENERAL ALLEGATIONS

3. The plaintiff, William R. Metallo is a citizen of Florida, United States of America at 1975 Lanier Court, Winter Park, Florida 32792.

4. Defendants, Orlando Utilities Commission ("OUC") is a Orlando City owned Electric Utilities Organization covered under the Public Utility Regulatory Policies Act of 1978 (PURPA) at 100 West Anderson Street, Orlando, Florida 32802.  Dan Kirby is President and Board Member at OUC at 100 West Anderson Street, Orlando, Florida 32802. John Hugh "Buddy" Dyer is Mayor of Orlando, Florida and Board Member at OUC at 100 West Anderson Street, Orlando, Florida 32802.   Wayne R. Zimmermann is AMI Project Manager at OUC at 100 West Anderson Street, Orlando, Florida 32802. At all times pertinent to the complaint defendants have been in the capacity of Electric Utilities Providers, Officers, Board Members, and/or employees of Orlando Utilities Commission.

5. Plaintiff is an individual disabled American veteran See **Exhibit ("A")** having disabilities received during U.S. Military service. He suffers severe hearing loss and tinnitus. Without plaintiff's permission or approval, OUC arbitrarily installed a smart meter at his residence. The smart meter created many physical and emotional problems for plaintiff amongst these problems were sleepless nights, violent

headaches, respiratory problems and frequent sneezing, low frequently humming and buzzing noises that produced shrill ear ringing, and, caused distraction concerning household functions, skin rashes, frequent power outages that created inconveniences and clock re-settings, lack of concentration, confusion and memory loss, insomnia and inability to return to sleep, dry skin. But most severe—was the loud and violent ear ringing that exacerbated his tinnitus condition.

6. Dr. Liya Sandra Perlingieri, Global Research, Centre for Research on Globalization, wrote on July 13, 2012:

7. "Over the past year, I have already personally seen the damage these dangerous meters (smart meters) have done to numerous people and several animals I know—all across the U.S. Although not generally reported by mainstream media. The serious impacts on people's health are evident. A short list includes: neurological impairment, ear pain and hearing problems, breathing dysfunctions, chest pains and heart ailments, burning skin, sleep disturbances, headaches, depression, vision troubles, blood pressure changes, sterility, autism, and neurodegenerative disease. There are numerous reports of people who are completely incapacitated from EMF exposure. Several people I know are almost constantly debilitated and

housebound, due to city-wide exposure to cell towers and Wi-Fi that has become ubiquitous. Most allopathic physicians are not trained in environmental medicine, and so often symptoms are misdiagnosed".

8. On July 26, 1990, Congress enacted the Americans with Disability Act ("ADA"), 42 U.S.C. sec. 12101, et seq., establishing the most important civil rights law for persons with disabilities in our country's history.

9.   The Congressional statutory findings include:

a) "some 43,000,000 Americans have one or more physical or mental disabilities;

b) historically, society has tended to isolate and segregate individuals with disabilities and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

c) discrimination against individuals with disabilities persists with illegal fee charging by utility providers towards disabled persons for opting-out of the smart meters proven to inflict harmful mental and physical harm;

d) individuals with disabilities continually encounter discrimination from several utility providers that refuse to abide by the Congressionally mandated Americans with Disability Act, 42 U.S.C. sec. 12101 et seq.;

e) continued existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity...to pursue those opportunities for which our free society is justifiably famous...42 U.S.C. sec.12101 (a)."

10.  Congress went on to state explicitly the purpose of the Americans with Disabilities Act to be:

a) "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c) to invoke the sweep of Congressional authority...to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. sec 12101 (b)

11.   Congress gave commercial businesses one and a half years to implement the Act. Effective date was January 26, 1992.

12. Nevertheless, the defendants at OUC refused to waive the opt-out fee barrier that prevented plaintiff from equally enjoying his premise. Additionally, they refused all written efforts made by plaintiff to resolve this matter by remaining silent. Then on **October 21, 2014,** OUC billed plaintiff $95 for an "enrollment" fee giving no explanation for what the "enrollment" fee represented, and $13 for an Opt Out AMI Meter Reading Charge (perpetual charge). See **Exhibit ("B")**

13. The U.S. Department of Justice, in promulgating the federal regulations to implement the ADA, defines "readily achievable" to mean "easily accomplishable and able to be carried out without much difficulty or expense."   Defendants could have easily resolved this matter simply by following the ADA law promulgated by Congress, and/or, responded to plaintiffs request to waive their illegal fees instead of refusing to waive the fees and remaining silent. See plaintiff's request to resolve the smart meter opt-out fees **Exhibit ("C")**

14. Plaintiff made every effort to resolve this issue. He requested assistance from U.S. Senator, Bill Nelson, writing him a total of three

times, but the Senator refused to give aid even though ADA and Civil Rights is a Federal matter under his jurisdiction. In fact, he remained silent. See **Exhibit ("D")**

15. Plaintiff filed a Complaint with the Florida Department of Agriculture & Consumer Services. The Agency attempted to resolve this issue but OUC refused. The Agency wrote: "Unfortunately, we do not feel that the business response satisfactorily resolved your complaint. Therefore, we are closing your complaint with a disposition of 'CM' which means that mediation attempts were unsuccessful...We regret that we were unable to resolve this complaint..." See **Exhibit ("E")**

16. Plaintiff filed a Complaint with the Better Business Bureau ("BBB"). See **Exhibit ("F").**

17. Moreover, it should be noted that waiving the OUC illegal fees would be "readily achievable" and "easily accomplishable" and would require nothing more than to abstain from billing those fees.

18. As relevant to the present action, discrimination includes the failure to waive the illegal "enrollment" and opt-out fees for the disabled plaintiff that was promulgated by Congress in ADA. . . "when doing is readily achievable" and "easily accomplishable" 42 U.S.C. 12182 (a) and (b) and 42 U.S.C. (2) (A) (i).

19. Congress included OUC as a public accommodation covered by the ACT 42 U.S.C. sec.3601 *et seq.*

20. Defendant's business at 100 West Anderson Street, Orlando, Florida 32802 is a public electric power and water provider.

21. Other electric power facilities similar to the defendant's have made it a policy to adhere to the Americans with Disability Act and waive opt-out fees, like what plaintiff asks here. Defendants could easily do likewise, but has chosen not to comply with the Americans with Disability Act.

22. Plaintiff wants to be free from the harmful effects of Electro-Motive Force [Field] ("EMF") associated with the smart meter and not be charged illegal fees by OUC for opting-out of the smart meter. . .  in violations of his civil rights under ADA.

## GENERAL ALLEGATIONS

23. Plaintiff requested removal of the smart meter and replacement of his analog meter for disability reasons. OUC complied with plaintiff's request and returned his analog meter. However, because plaintiff refused to accept the smart meter, OUC imposed a discriminatory $95 "enrollment" fee (giving no explanation for the meaning of enrollment

fee) and a perpetual $13 per month meter reading fee starting in October 2014. Plaintiff paid the illegal fees under protest on October 15, 2014.  See **Exhibit ("B").** It should be noted that OUC rightfully accepted plaintiff's disability request for smart meter opt-out, but wrongfully refuses to waive the illegal fees as mandated and required by the ADA.

24. OUC improperly authorized the mandatory opt-out fees and discriminates against plaintiff by refusing to waive their illegal fees in defiance to the dictates of the Americans with Disability Act and in violation of plaintiff's Civil Rights.

**An Opt-Out Fee Applicable to the Wireless Smart Meters by Utility Providers Violates the Americans with Disabilities Act.**

25. Any fee imposed to opt-out of the wireless mesh network-based Smart Meter violates Title II of the Americans with Disability Act. 42 U.S.C.  Sec.12131  *et   seq.*  Plaintiff  requested  reasonable accommodation to waive these illegal fees. See **(Exhibit "C")**

26. OUC, through Zimmermann, denied plaintiff's request.   In his letter dated August 21, 2014, Zimmermann wrote: "In accordance with the Fair Housing Amendment Act, if additional accommodations are necessary to enable an individual with a disability to live in and

enjoy their premises, the cost of those accommodations are required to be paid for by the individual with the disability". See **(Exhibit "G")**

27. Zimmermann misquoted the meaning of Fair Housing Amendment Act of 1968 ("FHAA").  FHAA, Under Reasonable Accommodations, requires two (2) types of reasonable accommodations to make existing housing more accessible to persons with disabilities.  These accommodations consist of structural modification and policy changes.

MODIFICATIONS

28. (1). Modifications may be made to the interior of the individual's unit as well as any public and common use areas of a building, including lobbies, hallways, and laundry rooms. Modification may be required in any type of dwelling: however, in a rental situation, the landlord may reasonably condition permission for modification on the following: (a) the renter agreeing to restore the interior of the premises to the condition that existed before the modification, ordinary wear and tear excepted. (b) The renter providing reasonable description of the proposed modifications. (c) The renter providing reasonable assurance that the work will be done in a workmanlike manner with all applicable building permits being obtained. The landlord may require that the tenant pay a reasonable amount of

money not to exceed the cost of the restoration, into an interest bearing escrow account. This means that when the tenant with the disability moves the unit is restored to its original condition.

POLICY CHANGES

29. FHAA requires that the housing provider makes reasonable modifications in rules, policies, practices or services necessary to give persons with disabilities equal opportunity to use and enjoy the dwelling. Examples that would be required include: (d) allowing a tenant who is blind to have a guide dog even though the building has a no pet policy. (e) reserving a parking space for a tenant with a mobility impairment that is accessible and close to an accessible route when other tenants must park on a first come, first served basis.

30. Modification and Policy Changes, as stated under FHAA Reasonable Accommodations, relates to structural improvements related to real estate property, whereas the "enrollment" fee and meter reading fee imposed by the defendants is a horse-of-another- color—a totally unrelated issue to Modification and Policy Changes and most importantly, contrariety to the Americans with Disability Act.

31. "ADA recognizes and protects against a backdrop of pervasive unequal treatment in the administration of state services and

programs including systematic deprivations of fundamental rights" (Tennessee v. Lane, 541 U.S. 509, 524 (2004).

32. "Title II prohibits exclusion from participation of, denial of benefits to, or discrimination against any qualified person with a disability in the services, or activities of a public entity" (42 U.S.C.sec.12132). Each state and local government, including a municipal utility, is required to follow the Americans with Disabilities Act Title II—*no exceptions.*

33. Title II applies to "anything a public entity does" (28 C.F.R. sec.35 App.B.41at 660). An act violates Title II when it has "the effects of subjecting qualified individuals with disabilities to discrimination on the basis of disability" (28 C.F.R. sec.35.130 (b)(3)(i). See Patton v. TIC United Corp., 77 F.3rd 1235, 1245, (10th Cir. 1996) (noting violation occurs regardless of whether the entity intended to discriminate against the disabled person).

34. OUC imposes mandatory fees on plaintiff's medical and emotional disabilities (listed in Paragraph 5) and especially the ear ringing and excruciating pain associated with tinnitus while plaintiff must opt-out of the smart meter to avoid interference these major life functions.

35. The American with Disabilities Act Access Board found as follows:

"The board recognizes that multiple chemical sensitivities and electromagnetic sensitivities may be considered disabilities under the ADA if they severely impair the neurological, respiratory or other functions of an individual that it substantially limits one or more of the individual's major life activities," See 36 C.F.R. Part 1191 [Docket No. 98-5] RIN 3014-AA16.

36. Following the recognition of EMF sensitivity and its declaration of commitment to attend to the needs of the EMF sensitive, the Access Board contracted the National Institute of Building Sciences (NIBS) to examine how to accommodate the needs of the EMF sensitive in federally funded buildings. In 2005 the NIBS issued a report making further recommendations.

37. In the instant case, the Commission has directed that significant upfront monthly fees be charged on an interim basis, and is exploring the imposition of such fees on a permanent basis, for anyone that elects to opt-out of the Smart Meter program or to retain his or her existing analog meter. While such a program appears superficially to affect all citizens equally because it imposes the fees to all those who elect to opt-out, it imposes a *mandatory* fee of those with an EMF sensitivity disability who *must* opt-out to avoid interference with major

life functions. In essence, ratepayers who have such a condition are burdened with a fee which is wholly and inescapably related to and caused by the fact of their disability, and unavoidable for the same reason. This is particularly troubling when it is unlikely that paying these fees will in most instances actually continue to cover the customer's premises.

38. Title II of the ADA of 1990 prohibits discrimination on the basis of disability in programs and activities of all state and local governments. The intent of this landmark legislation is to protect the civil rights of people with disabilities and ensure they have the same opportunity available to persons without disabilities. Courts achieve equity by providing reasonable accommodations to disabled people to level the playing field.

39. Title II also provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity".

40. Title III provides "A reasonable accommodation must be granted when an accommodation is necessary to afford a prospective or

existing tenant with a disability an opportunity to use and enjoy a dwelling to the same extent".

41. The defendants, by discriminating and denying plaintiff's entitlement under the provisions of the ADA, have violated plaintiffs U.S. Constitutional Rights. Civil Rights are violated when the practice of personal preferences and prejudices of an individual, a business entity, or a government interferes with the protected rights of others. Various civil rights laws have made it illegal to discriminate on the basis of race, religion, sex, *handicap*, or national origin. See Sec. 804. [42 U.S.C. 3604 (f)(3)(B)].

42. The Bill of Rights to the U.S. Constitution delineates specific rights that are reserved for U.S. citizens and residents. No state can remove or abridge rights that are *guaranteed* by the Constitution.

43. There exists no logical reason for OUC to charge plaintiff these illegal fees--except to grab-off monies. Proof of this:  No "enrollment" fee or meter reading charge existed during the period when plaintiff's analog meter was originally in place.

44. Plaintiff's denial by OUC for reasonable accommodation and thus his Civil Rights is predicated strictly on perpetuating the AMI program. Wayne Zimmermann made this point clear in his letter dated August

21, 2014, **(Exhibit "G")** when he misquoted the Fair Housing Amendment Act in response to plaintiff's request for reasonable accommodation he wrote:

45. "In accordance with the Fair Housing Amendment Act, if additional accommodations are necessary to enable an individual with a disability to live in and enjoy their premises, the cost of those accommodations are required to be paid for by the individual with the disability. To waive the opt-out fees for one group of customers without offering the same benefit to all OUC customers would seem unfair and to waive them for all who opt out would *undermine the AMI program"*. **(Exhibit "G")**

46. Defendant Zimmermann misquoted the Fair Housing Amendment Act of 1988 ("FHAA"). The FHAA added persons with a "handicapping condition," along with families and children, as protected classes under the Civil Rights Act. The legislation adopts the definition of handicapping condition found in Section 504 of the Rehabilitation Act of 1973, as amended. This definition includes any person who actually has a physical or mental impairment, has a record of having such and impairment, or regarded as having such an impairment that substantially limits one or more major life activity such as hearing,

seeing, speaking, breathing, performing manual tasks, walking, caring for oneself, learning or working.

47. Section 504 of the Rehabilitation Act of 1973, as amended contradicts what Zimmermann wrote. His writings were obviously intended to dissuade plaintiff from receiving his request for reasonable accommodation and to perpetuate the AMI Program in defiance to the Americans with Disabilities Act.

**Wherefore,** plaintiff prays that this Court will issue an injunction enjoining the defendants from continuing its discrimination, return all monies illegally charged plaintiff, and that the Court will award plaintiff such additional or alternative relief as may be just, proper, and equitable, including costs.

Respectfully submitted,

William R. Metallo, pro se
1975 Lanier Court
Winter Park, Florida 32792
(407) 599 2129

Dated _11-26-14_

Enclosures: Exhibits A, B, C, D, E, F, G